[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff seeks by way of prejudgment remedy an attachment of 10% of the gross receipts from the operation of the defendants' business to secure the sum of five hundred thousand ($500,000.00) dollars. The plaintiff alleges that the defendants wrongfully stole from the plaintiff and converted for their own use: executory contracts, trade secrets, proprietary software, a trade name, methods of doing business, and customers. Counts one and two of the complaint claim that the defendants were unjustly enriched by their actions and that the plaintiff was financially damaged; counts three and four claim tortious interference with business expectancies; count five claims breach of the individual defendants' fiduciary duties as employees; count six claims breach of the individual defendants' covenant of good faith and fair dealing as employees; count seven claims breach of the individual defendants' obligations of fidelity; and count eight claims conversion. The court heard testimony on May 15 and May 21, 2001. In addition, the court had the benefit of briefs submitted by the parties on the issue of common law rights to proprietary interest in a trade name.
 FACTS
The plaintiff, Northeast Distribution, Inc. (Northeast), initiated a division called Premier Logistics Services in October, 1997. Northeast hired the defendants, Brian Nadeau and Girard A. Robitaille, Jr., to initiate the business of the subdivision. Since Nadeau and Robitaille, Jr. were skilled in operations, but not in marketing and sales, Girard A. Robitaille, Sr. was hired early in 1998 to solicit customers. All three of these defendants had been employed previously by Trans Advo, a company in a similar field of work. The defendant, David Francis, was CT Page 8812-z added as an employee in early 1999; the defendant, Craig Allan, joined as an employee in the fall of 1999. By October, 2000, there were a total of twelve employees in the Premier Logistics Services division of Northeast.
During all the time that the individual defendants worked for Northeast's Premier Logistics Services division, they had no written employment contracts. They never signed non-compete agreements; they had no guarantees as to duration of employment nor amount of compensation. They were employees at will.
Like the parent company Northeast, Premier Logistics Services was in the business of arranging for customers to have freight hauled. Unlike the parent company Northeast, Premier Logistics Services specialized in arranging for delivery of time-sensitive advertising material for retailers. Premier Logistics Services contracted for each individual job with retailers (or brokers for retailers) and similarly contracted with freight haulers for each job. There were no long-term or blanket contracts for any jobs.
In the short initial year of 1997, Northeast's Premier Logistics Services grossed $300,000 to $400,000. The following year the division grossed $1 million to $1.5 million. In 1999, the gross was about $4 million and the division turned a net profit of $350,000. Over the three years of the existence of Premier Logistics Services, Northeast committed about $200,000 to the development of computer software, dubbed "Drop Ship", for the operations of Premier Logistics Services.
The operations of Northeast's Premier Logistics Services division came to an abrupt end at the close of the business day October 18, 2000. All twelve employees of the division resigned simultaneously and went to work for a newly-formed company — the defendant, Premier Logistics Services, Inc. (PLS, Inc.). Some or all of the individual defendants are owners of all the stock of PLS, Inc.
When they left the employ of Northeast, the defendants took with them the files of all jobs in progress. They caused those jobs to be completed. The parties have already stipulated that Northeast has received or will receive all net proceeds from those jobs. There are jobs as to which there may be a dispute as to their pendency on October 18, 2000, in particular the Sam's Outbound Catalogue job. The parties have stipulated on the record that they will exchange necessary documents, pay outstanding costs, and submit to binding arbitration as to the allocation of the net proceeds from those disputed jobs. CT Page 8812-ba
Since October 18, 2000, Northeast has ceased all operations in its Premier Logistics Services division. Northeast has not attempted to continue in the distribution of time-sensitive advertising material for retailers. It has not contacted potential customers for that purpose; it has no operational telephones for that division. With the loss of all its division employees, Northeast was unwilling or unable to revitalize its Premier Logistics Services division. Any good will generated by the three years of its Premier Logistics Services operation was of minimal or no value to Northeast as soon as it ceased operations entirely in that type of business.
Sufficient evidence was put forward for purposes of a probable cause standard to justify the following additional findings:
 1. The defendants appropriated the name "Premier Logistics Services" and its logo from Northeast. It had been a trade name and logo developed and used exclusively by Northeast to identify its time-sensitive ad material distribution division. Neither the name nor the logo was registered with the Secretary of the State nor any municipality.
 2. Northeast's Premier Logistics Services maintained a web site at www.premierlogistics.com; PLS, Inc. maintains a web site at www.premierlogisticsusa.com. The use of Northeast's divisional name by the defendants has caused confusion in that Northeast has received telephone calls, web site hits, and invoices from freight carriers intended for PLS, Inc. Robitaille, Jr. deliberately designed the PLS, Inc. letterhead to be similar to the letterhead of Northeast's Premier Logistics Services. He did the same with the load confirmation report form and the bill of lading form.
 3. The defendants removed from the premises at Northeast's Premier Logistics Services division not only files of all pending jobs, but also files of some completed jobs, personnel files, and lists of customers and freight carriers. The lists may have been printed out on paper or may have been downloaded onto disks. CT Page 8812-bb
 4. Files of pending and completed jobs were returned to Northeast on or about December 15, 2000.
 5. PLS, Inc. hired a computer consultant, who prepared software for the operations of PLS, Inc. from handwritten specifications provided by Robitaille, Sr. That consultant, Greg Ruffy, developed the software, called "PLS 2000", without seeing Northeast's Drop Ship software.
 6. Francis knew that Northeast was considering firing him during the summer of 2000. Robitaille, Jr. and Robitaille, Sr. experienced increases and then rollbacks of their salaries during the year 2000.
 7. The defendants were in contact with a substantial customer, Ace Marketing, before their departure from Northeast. On or about October 18, 2000, Ace Marketing loaned $100,000.00 to Robitaille, Sr. for the start-up of PLS, Inc.
 APPLICABLE LAW
To order a prejudgment remedy, a trial court must determine that the credibility of witnesses and the totality of the evidence presented probably weigh in the plaintiff's favor. It is necessary to "evaluate the arguments and evidence produced by both parties to determine whether there is probable cause to sustain the validity of the [plaintiff's] claim." (Internal quotation marks omitted.) Tyler v. Schnabel,34 Conn. App. 216, 219, 641 A.2d 388 (1994). See General Statutes, §52-278d(a). "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false."Village Linc Corp. v. Children's Store, Inc., 31 Conn. App. 652,657-658, 626 A.2d 813 (1993); Three S. Development Co. v. Santore,193 Conn. 174, 175, 474 A.2d 795 (1984).
The defendants took Northeast's executory contracts. They fulfilled the obligations of Northeast under those contracts and paid or will pay all net proceeds to Northeast. Northeast has sustained no monetary loss from the appropriation of the executory contracts.
Northeast asserts that the defendants co-opted trade secrets. Northeast's witness, Mark Tonon, defined "trade secrets" as: "How we CT Page 8812-bc operated the business, . . . which carriers moved freight cheaper, and other information which we put together over time. . . . Also pricing structure as to certain carriers." (May 14, 2000 testimony of Mark Tonon [Tonon testimony]). He referred to this information as "privileged" (Tonon testimony). However, Tonon also acknowledged under cross-examination that the identities of and prices for freight carriers and customers of Northeast's Premier Logistics Services division were in the public domain. Nothing prevented a competitor from soliciting the same carriers and customers. There was no peculiarity about this business or its customer list which made it secret. The identities of customers and freight carriers were readily ascertainable through ordinary business channels or trade directories. A customer list is not a trade secret when the plaintiff made no attempt to hide it from those not authorized to see it, when the defendants had not signed covenants not to compete, when the plaintiff's business was not seriously affected by the defendants' use of the list, when the information on the list could have been easily obtained from other sources, when the plaintiff's list contained no confidential data, and when no relationship of confidence or trust existed between the plaintiff and the defendants (i.e., they were merely employer and employees). See Holiday Food Co. v. Munroe, 37 Conn. Sup. 546,426 A.2d 814 (1981).
Northeast set forth no evidence regarding a unique way of operating the business and therefore failed to sustain its burden of showing probable cause as to the conversion of trade secrets. Northeast also failed in its showing of probable cause as to the theft or misuse of the Drop Ship software.
Without question the defendants appropriated Northeast's trade name, Premier Logistics Services, and its logo. Whether or not the defendants' conduct constituted unfair competition is a question of fact to be determined by the trier of fact. See Transparent Ruler Co. v. C-ThruRuler Co., 135 Conn. 181, 62 A.2d 668 (1948). "No inflexible rule can be laid down as to what use of names will constitute unfair competition this is a question of fact. The question to be determined is whether or not, as a matter of fact, the name is such as to cause confusion in the public mind as between the plaintiff's business and that of the defendant, resulting in injury to the plaintiff. The test is whether the public is likely to be deceived." Middletown Trust Co. v. Middletown NationalBank, 110 Conn. 13, 20, 147 A. 22 (1929). Failure to register a trade name does not deprive a business of the ability to protect that name from misuse or unfair appropriation by another entity under common law principles. Another entity may not rely upon lack of trade name registration to appropriate the goodwill of another business or refuse to CT Page 8812-bd honor contractual obligations with that business. See Sagal v. Fylar,89 Conn. 293, 93 A. 1027 (1915).
Although Northeast has not specifically pleaded a count of unfair competition in its complaint, Northeast has alleged facts sufficient to support such a claim. The evidence adduced in court established that there is probable cause Northeast can prevail on the merits on a claim of unfair competition. Despite Northeast's eloquent brief concerning the Lanham Act, 15 U.S.C. § 1125(a) (1982), Northeast's complaint does not invoke that act. A plaintiff relying upon a statutory cause of action must plead that action and its basis with specificity. See Practice Book § 10-3. For purposes of this application for prejudgment remedy, the court will not address the merits of a statutory claim which has not been set forth in a pleading.
As employees at will, the defendants were not obligated to continue working for Northeast. Without those employees, Northeast was unable or unwilling to keep its Premier Logistics Services division operational. Since Northeast shut down its business willingly, albeit suddenly and grudgingly, as of October 19, 2000, Northeast has suffered no loss from the opening of the defendants' business. The loss stemmed from the departure of the defendants from Northeast and the termination of their skills and services at Northeast.
Although Northeast has established probable cause to prevail on the elements of unfair competition, the award of a prejudgment remedy must be supported by a showing that the Northeast suffered an actual loss at the hands of the defendants and could prove such a loss. "In undertaking the probable cause analysis that our present [prejudgment remedy] statute requires, a court is required to consider not only the validity of the plaintiff's claim but also the amount that is being sought." Union TrustCo. v. Heggelund, 219 Conn. 620, 625, 594 A.2d 464 (1991). At the prejudgment remedy hearing the movant has the burden of establishing the probable amount of damages. See Mullai v. Mullai, 1 Conn. App. 93, 94,468 A.2d 1240 (1983).
Northeast has not sustained its burden of proof that it incurred damages as a result of unfair competition or as a result of the causes of action specified in its complaint. The departure of employees from Northeast, even when undertaken en masse, was not an illegal act nor an act in breach of employee covenants. It was that departure that caused Northeast to close its Premier Logistics Services division doors, not the competition of the new company nor the appropriation of the trade name or logo. CT Page 8812-be
Northeast has failed to demonstrate an amount of damages separable from the closing down of its own Premier Logistics Services division. Accordingly, the application for prejudgment remedy is denied.
Winslow, J.